UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| TY EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | 1:07-cv-592-DFH-JMS |
| | ) | |
| FRANK POSKON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Motion for Summary Judgment**

Ty Evans alleges in this civil rights action that members of the Indianapolis Police Department Metropolitan Drug Task Force Unit ("Task Force") used constitutionally excessive force on May 16, 2005 and/or failed to intervene in the use of such force by others. The defendants are Task Force members who seek resolution of Evans' claims through the entry of summary judgment.

Whereupon the court, having read and examined the pleadings, the motion for summary judgment, and the materials relating to such motion, and being duly advised, finds that the defendants' motion for summary judgment must be granted. This conclusion is based on the following facts and circumstances:

1.      Plaintiff Ty Evans alleges that he was the victim of constitutionally excessive force during the course of his arrest in Indianapolis, by members of the Task Force and that other defendants failed to intervene. These claims have previously been determined to be viable against the following defendants, who are sued in their individual capacities as members of the Task Force.

| | | |
|---|---|---|
| Frank Poskon | Jeffrey Krider | Jeffrey Avington |
| Eric LeDoux | Barb Maxey | S. Kinkade |
| J. Bradbury | M. Hertzman | S. Jackson |
| J. McPherson | R. Foster | G. Waggoner |
| T. Hudson | T. Cline | T. Steele |

2.      As noted, the defendants seek resolution of Evans' claims through the entry of summary judgment. As with any such motion, the defendants' motion for summary judgment must be granted if "there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." *Scott v. Edinburg,* 346 F.3d 752, 755 (7th Cir. 2003) (quoting FED. R. CIV. P. 56(c) and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). The role of Rule 56 is to "enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990). "The applicable substantive law will dictate which facts are material." *National Soffit & Escutcheons, Inc., v. Superior Systems, Inc.,* 98 F.3d 262, 265 (7th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "Factual disputes are 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [non-movant].' " *Oest v. Illinois Dep't of Corrections,* 240 F.3d 605, 610 (7th Cir. 2001) (quoting *Anderson,* 477 U.S. at 247). A "material fact" is one that "might affect the outcome of the suit." *Anderson,* 477 U.S. at 248.

      3.     Evans' claims are asserted pursuant to 42 U.S.C. § 1983. Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights elsewhere conferred." *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "[T]he first step in any [§ 1983] claim is to identify the specific constitutional right infringed." *Albright v. Oliver,* 510 U.S. 266, 271 (1994); *see Conyers v. Abitz,* 416 F.3d 580, 586 (7th Cir. 2005)("[C]onstitutional claims must be addressed under the most applicable provision."). The claims asserted by Evans invoke the following constitutional provisions:

> a.     "[A]ll claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 396 (1989). The Fourth Amendment prohibits the use of excessive force during the execution of a seizure. *Estate of Phillips v. City of Milwaukee,* 123 F.3d 586, 592-93 (7th Cir. 1997) (where an offender is resisting arrest, an officer can use that amount of force necessary to overcome the offender's resistance), *cert. denied,* 522 U.S. 1116 (1998).

> b.     A state actor may be liable under a theory of failing to intervene to prevent unconstitutional harm under a due process theory when (a) that individual was present and had reason to know that a constitutional violation was being committed by a law enforcement officer, and (b) he had a realistic opportunity to prevent the harm from occurring. *Yang v. Harden,* 37 F.3d 282, 285 (7th Cir. 1994); *Lewis v. Richards,* 107 F.3d 549, 553 (7th Cir. 1997).

      4.     A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 255; *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003). The court must "construe all facts in a light most favorable to . . . the party opposing summary judgment, and . . . draw all reasonable inferences in his favor." *McGreal v. Ostrov,* 368 F.3d 657, 672 (7th Cir. 2004) (citation omitted). "'In the light most

favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook,* 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith v. Severn,* 129 F.3d 419, 425 (7th Cir. 1997)). The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Evans as the non-moving party. See *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

    a.    On May 16, 2005, at approximately 7:30 p.m., undercover officers from the Task Force were conducting surveillance of the grocery store parking lot at 7101 East 10th Street in Indianapolis. Earlier that day, they had received information that Ty Evans planned to commit a home invasion robbery later that night around 7:30. As was usual, members of the Task Force wore plain clothes and operated unmarked vehicles. Also, because members of the Task Force operated as undercover officers, none of these officers was in possession of CS spray or a Taser on the night of May 16, 2005.

    b.    In conducting their surveillance, Task Force officers observed the green 1999 Ford Explorer registered to and driven by Evans. Melinda Keedy, a confidential informant wearing an electronic transmission recording device known as a "Kel-Set" to record Evans' statements, had agreed to meet Evans at approximately 7:30 p.m. that night at the grocery store parking lot. Task Force officers observed Keedy arrive at the grocery store parking lot at 7101 East 10th Street and enter the passenger-side of Evans' truck. While listening on the electronic transmission recording device, Officer Krider and Officer Poskon heard Keedy ask Evans, "Do you want me to drive?" Evans responded, "No, I've got to go home and get my piece."

    c.    Officers observed Evans and Keedy exit the grocery store parking lot in Evans' truck and head towards the address of 6611 Springer Avenue in Indianapolis, which Keedy had previously identified to the officers as Evans' residence. When Evans and Keedy arrived at Evans' residence located at 6611 Springer Avenue, Evans pulled the truck into the garage and closed the overhead door. While listening to the Kel-Set, Officer Poskon heard Evans and Keedy enter Evans' house. A few seconds after Evans and Keedy entered Evans' residence and while Officers Krider and Poskon listened to the communications via the electronic transmitter recording device worn by Keedy, Officers Krider and Poskon could hear screaming, strangulation, and sounds of a struggle over the Kel-Set and heard a male voice saying, "you f----- with the wrong guy this time b----!" Officer Poskon heard what he thought to be pool sticks hitting a linoleum or tile floor.

    d.    Officer Poskon announced several times over the police radio, "We got a problem! Hit the house! We got a problem! Hit the house!" Officers converged on Evans' house pounding on the door and loudly yelling, "police." Officer Poskon ran to the side door of the residence, looked through the large glass window and scanned the inside of Evans' house. Officer Poskon saw the pool table, a large

fireplace in the center of the room and lights shining down on both sides of the fireplace. Officer Poskon then bent over toward the ground, scanned the room again, and this time saw two legs sticking out towards the pool table from the fireplace area and a body wearing light-blue jeans on top of the legs. Officer Poskon yelled, "They're in there! Hit it! Hit it! Hit the door! Kick it in!"

e. Officers Avington, Poskon and Krider continued pounding on the side doors and yelling "police" and "open the door!" Evans came to the side door and began saying, "I can't, you broke it. You broke it." Officer Poskon observed Evans through the long glass window moving his left hand towards the door but then pulling it back. Officer Poskon yelled at Evans saying, "Get your – your left hand through and – and do something with it." These officers were yelling "police" and pointing their guns at Evans. Detective Avington kicked the side door several times while yelling "police" and eventually kicked the side door open and the officers entered the residence.

f. When Officer Poskon gained entry, he went to Keedy who was lying face down on the floor near the fireplace. Officer Poskon yelled, "Get an ambulance, get an ambulance!" Officer Avington approached Keedy, who was lying face down, motionless, by the fireplace, rolled her over and observed that she had a rope around her neck. Officer Avington saw a glove near the fireplace and removed the rope from Keedy's neck.

g. Officer Maxey observed a deep laceration on Keedy's mouth and a deep laceration on Keedy's neck from the rope. Officer Maxey also observed redness on Keedy's face, blood and foam coming from Keedy's mouth. She further observed that Keedy had urinated on herself and her eyes were rolling back in her head. Officer Maxey believed Keedy was going to die. Officer Maxey asked Keedy if Evans had done that to her. Keedy nodded in an affirmative manner.

h. Officer Krider attempted to place Evans under arrest; Evans refused and the two went to the floor in a struggle. Officer Krider mounted Evans' back and tried to get Evans' arms behind his back. Officer Krider had his gun in one hand and his police radio in his other hand. Officer Krider did not have a Taser or CS Spray since he and other members of the Task Force are undercover officers. Evans actively resisted Officer Krider's efforts to get Evans' arms behind his back. Officer Krider orally commanded Evans to "[p]ut your hands behind your back!" Officers orally commanded Evans to stop resisting. Evans refused to comply with officers' orders by pulling his arms underneath his body, trying to roll Officer Krider off his back and kicking his legs. Officer Krider employed several knee strikes, with no success, to Evans' thigh in an effort to get Evans to place his arms behind his back.

i. Officers managed to apply one handcuff onto Evans' left wrist but Evans tucked his right arm underneath his body to prevent the officers from handcuffing that wrist. Evans continued trying to roll Officer Krider off his back and into the pool table. Officer Krider did not strike Evans with his police radio or gun. Officer Krider did not kick Evans.

j. Officer Foster tried to hold down Evans' legs. Officer Ledoux attempted to stand on Evans' legs. Evans continued to forcibly resist the officers by kicking and refusing to release his right arm from underneath his body. Officer Poskon observed that Officer Krider was having difficulty gaining control of Evans. Prior to Officer Poskon approaching Evans, Officer Krider did not have control over Evans. Officer Poskon observed Evans bucking Officer Krider. Speaking in generalities while testifying in Evans' criminal trial, Officer Poskon stated that he struck Evans "repeatedly." Officer Poskon remembers approaching Evans and striking Evans in the face with his left fist two to four times until Officer Poskon fractured his finger. Officer Krider observed Officer Poskon strike Evans two to four times with his fist. As Officer Poskon was striking Evans, "Evans continued trying to get underneath the pool table, for what, Officer Poskon did not know." After Officer Poskon fractured his finger, he [Officer Poskon] went back over to Keedy. Being an undercover officer, Officer Poskon did not have a Taser or CS spray with him that night. Officer Poskon only had his gun; he did not strike Evans with that gun. Officer Poskon did not kick Evans at any time.

k. After Officer Poskon struck Evans in the face with his left hand, Officer Krider managed to pull Evans' right arm from underneath his body and apply the other handcuff, thus placing him under arrest. After Officer Krider managed to get the handcuff on Evans' right wrist and effectuate the arrest, Evans stopped struggling. Officer Krider called for an ambulance and left Evans on the floor and walked away with other officers to tend to Keedy.

l. Evans was placed under arrest. The Marion County Prosecutor subsequently charged Evans with attempted murder, aggravated battery, criminal confinement, resisting law enforcement, and as a habitual offender. A jury found Evans guilty as charged. The trial court vacated the aggravated battery and criminal confinement convictions on double jeopardy grounds. These convictions were affirmed in *Evans v. State*, 855 N.E.2d 378 (Ind.Ct.App. 2006), *trans. denied*, and those convictions have not been set aside by appeal, collateral review, or pardon.

5. The rule of *Heck v. Humphrey*, 512 U.S. 477 (1994), on which the defendants rely in seeking summary judgment, is this: The plaintiff cannot proceed where "success in a . . . [42 U.S.C. §] 1983 damages action would implicitly question the validity of conviction or duration of sentence, the litigant must first achieve favorable termination of his available state, or federal habeas, opportunities to challenge the underlying conviction or sentence." *Muhammad v. Close,* 540 U.S. 749, 751 (2004) (citing to *Heck*); *see also Apampa v. Layng,* 157 F.3d 1103, 1105 (7th Cir. 1999). "[U]nder *Heck,* a § 1983 claim for damages is not cognizable (*i.e.* does not accrue) if a judgment in favor of the plaintiff on that claim 'would necessarily imply the invalidity of [the plaintiff's] conviction or sentence.'" *Snodderly v. R.U.F.F. Drug Enforcement Task Force,* 239 F.3d 892, 896-97 (7th Cir. 2001)(citing *Heck,* 512 U.S. at 487).

      6.      The rule of *Heck* was cited earlier in this case as precluding Evans' claim for damages based on his allegation that police officers altered or destroyed physical evidence and that as a consequence Evans was convicted of one or more offenses based on events occurring on the evening of May 16, 2005. That claim was dismissed without prejudice on August 1, 2007, pursuant to 28 U.S.C. § 1915A. This same rule is invoked by the defendants in arguing that Evans' excessive force and failure to intervene claims are not actionable. The defendants argue that the facts Evans relies on and the events on which Evans' criminal conviction for resisting law enforcement is based are intertwined and that, therefore, Evans' claims are barred. The defendants' argument requires that the court determine whether, if Evans' claims were successful here, that would necessarily imply the invalidity of any of his criminal convictions.

      a.      The parties' versions of what occurred at Evans' residence on the evening of May 16, 2005, are different in material respects. Both the complaint and Evans' "statement of facts in dispute" are filled with statements that call into question the validity of Evans' criminal conviction. For example, Evans states in these filings that a third person, Billy Neely, was the person who strangled Keedy with a rope inside Evans' house. Evans also states that he fully complied with officers' commands and did not resist law enforcement officers at any time.[1] Evans claims that while he was pinned on the floor and not resisting, Officer Poskon repeatedly punched him in the face until Poskon broke his own hand and Evans became unconscious. Evans alleges that as he lay unresponsive on the floor the officers continued to beat him.

      b.      Evans' version of the incident necessarily implies that his conviction for resisting law enforcement was unlawful. In essence, Evans claims that he was not behaving in any manner that would justify the use of force by any officer. He contends that he is innocent of causing any harm to Keedy and that he just intended to scare her. The defendants take the position, as is supported by Evans' convictions for attempted murder and resisting law enforcement, that Evans is responsible for creating and continuing the confrontation with the officers and for escalating the force which was necessary to gain control over him and place him under arrest. Although it is clear that Evans disagrees with how the police interpreted and responded to the circumstances at his house on May 16, 2005, such disagreement does not avoid the barrier imposed by *Heck*. Indeed, it is Evans' insistence on pressing his view of the facts which is contrary to those found at trial

---

[1] For example, the following statements are made: "The command for Evans to put his hands up did not have to be repeated," "Evans took one step back, remained in view, and allowed Avington to kick the door open," "No allegation that Evans made a fist, made a threatening gesture, threw a punch, applied martial arts tactics, pushed at Krider, kicked at Krider, pulled away from Krider, or physically impeded Krider's tackle . . . . Evans did not try to flee," "Evans did not have any weapons," "No officer gave anyone any indication that a struggle was going on or that assistance was needed." "Evans complied and was cuffed . . . Evans did not struggle after being cuffed." Plaintiff's Response, pp 5-7 (dkt 57).

and on appeal that compels the conclusion here that his excessive force claims are barred by *Heck*. See *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003) (as "master of his ground," if a plaintiff makes allegations that are inconsistent with his valid convictions, "*Heck* kicks in and bars his civil suit"). Evans' allegations, sworn statements, and proposed expert testimony present facts that are inconsistent with and necessarily imply the invalidity of his criminal conviction for resisting law enforcement. Accordingly, his claims of excessive force and failure to intervene are barred by *Heck* unless and until his convictions are set aside.

7.  The defendants' motion for summary judgment (dkt 49) is **granted.** Judgment consistent with this Entry shall now issue. The dismissal shall be without prejudice. The court need not address the other grounds on which the defendants seek summary judgment.

So ordered.

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Date: July 28, 2009